[No. 6,853.—Department One.]

KATE SPEARMAN ET AL. v. CALIFORNIA-STREET RAILROAD COMPANY.

NEGLIGENCE — COMMON CARRIER — CONFLICT OF EVIDENCE.—Certain testimony stated in the opinion, although contradicted by other testimony, *held* to be sufficient proof of negligence to sustain a verdict.

APPEAL from a judgment for the plaintiffs, and an order denying a new trial, in the Fifteenth District Court, City and County of San Francisco. DWINELLE, J.

The action was brought by the widow and children of one Frank Spearman for damages resulting from the death of the latter, claimed to have been caused by the negligence of the defendant. The defendant was a common carrier of passengers, operating a street-railroad.

*J. E. Foulds*, for Appellant.

*Alex. Campbell*, *Milton Andros*, and *Charles Page*, for Respondents.

The COURT:

The principal point relied on by the appellant is, that the evidence does not show that the deceased came to his death by reason of the negligence of the defendants, or its agents, but by his own fault. While it is true that there is a good deal of testimony in the record going to show that the latter was the true cause, it is also true that there is testimony to the contrary. Thus: "James A. Garrett, being sworn, testified: I am an engineer in the employ of the Clay-street railroad, and have been an engineer since I was fourteen years old, most of the time in England. I am acquainted with the manner of running street-railroads. Did not know Frank Spearman in his life. He was killed by dummy No. 5, at Fillmore street. I was present. It was at the terminus. No. 5 was on the stand ready to start, and I was on No. 7; No. 6 and the car attached stood between me and No. 5, on the north track; No. 5 was on the south track. When I arrived, I did not see any one around No. 5, and went

down from my dummy around No. 5, and into the saloon on the south-east corner of California and Fillmore streets. There I saw the conductor and driver of No. 5 in the saloon. I asked the conductor if they were going on, and said that they were behind time, and told them to go on.

"The driver (Mr. Hoag) left the saloon and got on his dummy. The conductor went to the lunch table and took some lunch, and then rushed to the door. When he got to the door, he said, 'All right,' with his mouth full of meat. Hoag was standing with his hand on the lever, looking at the saloon door; and when Matthews came out, he pulled the lever. The dummy then 'surged' ahead. Deceased had his foot on front step, on the inside of the dummy. The surging of the dummy whirled him round. He tried to recover himself, and fell in front, underneath the dummy. I rushed out to where the dummy was. It took less time than it takes to tell it. Before the dummy started, it stood opposite to the saloon. When the driver pulled the lever, he was looking at the door of the saloon, and did not see the man getting on. The reason I went down was because No. 5 was behind time; and I had been down several times during that day to help him, because he had lost his hold of the rope which propelled the cars. I had only known Hoag as a driver for a few days previously. I did not think he was competent. He had several accidents, missing his rope. It happened more frequently with him than any of the rest. I worked on a railroad of this description over a year. Helped to start the Clay-street railroad, and went on their dummy as a driver; then went on the California-street railroad, and helped to fix the tracks up and fix the dummies. At the time of the accident, I had driven a dummy something similar to this one for about six months on the Clay-street railroad, the difference between them being that the one works with a lever and the other with a wheel; and I acted as dummy driver on the California-street railroad from the time it started, commencing work for that company on the second week in February, 1878, and working up to the last week in August. Consider myself an expert. I did not consider Hoag a competent driver, from his way of handling a dummy. He jerked on the rope, and stopped and started quickly. This caused the dummy to surge ahead

when starting; and when stopping, to stop too quickly. This would have the effect of jerking people about on the dummy, and throwing them backwards and forwards, making the dummy jump. The proper way to start a dummy is to start it easily, taking the grip slowly, and the friction of the rope passing through the dies will carry it along. I saw Hoag at that time jerk the rope when he started; that the dies came down solid on the rope, and the dummy 'surged' ahead, rolling and jerking the passengers backwards and forwards. This was caused by his pulling the lever suddenly on. The conductor's business is to start the cars. There was no car on No. 5 dummy. They were running a car with each alternate dummy. No. 6 had a car, and No. 7 did not. When the deceased was taken from under the dummy, he appeared to be crushed across the chest, and lay helpless. I called to a boy there to fetch Matthews (the conductor of No. 5) and Dr. Humphreys; but Dr. Humphreys was there, and stated who he was. I then said to him, ' See what you can do for this man, and the company will pay all the damages.' He said the man was dead. I attribute the man's death to the sudden ' surge ' ahead of the dummy. It threw him around on the front dash-board."

The material parts of the testimony of this witness were contradicted by that of a number of other witnesses; but the credibility of the witnesses was a question for the jury, and is not for us. We have read the record carefully, and find in it sufficient testimony, if true, to sustain the verdict. All of the instructions asked for by the defendant were given, but with a modification, to which objection is made, not because it is not sound law, but because it is claimed there was no evidence to which it applied. In this, however, counsel are mistaken. The case was fairly put to the jury by the Court below, which, upon evidence substantially conflicting, returned a verdict for the plaintiff.

Judgment and order affirmed.